77 We're ready when you are, Mr. Pettis. Just one second, Your Honors. May it please the Court, my name is Richard Pettis and I represent the appellant, Teva, in this appeal. I'd like to address today three points, if I may. The first is the invention of Claim 19 of the 969 patent, and more specifically, how it bears all the hallmarks under this Court's precedent of non-obviousness, including how it broke with 40 years of conventional wisdoms in the field of oral contraceptives, and how it did so in the face of heavy skepticism from, and prior failures of, some of the leading experts in the field, and ended up, unexpectedly, improving the number one major problem with extended regimens, which was breakthrough bleeding. What's the difference between your arguments here, that you made at trial, or responded to at trial, I guess, in terms of their burden, but what is the difference between those issues and the issues that were taken up and considered in the Duramed case before this Court? Your Honor, there is quite a bit of additional evidence that now Teva had an opportunity to present at trial, which it didn't, in the posture of summary judgment, where it actually prevailed. So, it wasn't in a position where, at trial, we presented on the clear teachings of way in the art, which showed that the addition of unopposed estrogen in the hormone-free period actually made this breakthrough bleeding problem worse. There were also a number of other teachings which sent a person of skill in the art in a different direction than this invention. And the admissions by defendants experts are very critical to this appeal, and were not properly credited by the Court. So, your focus on teaching a way at trial was not the headaches, it was the breakthrough bleeding. Well, again, our focus at trial, two answers to that. Yes, it's breakthrough bleeding, and there's two reasons. One is because the defendant's position changed at trial, and they went with a different motive. It was efficacy. And then they tried to argue breakthrough bleeding was also a motive, but their expert had admitted before trial that it couldn't have been a motive. And he admitted on the stand at trial that the data in the record that he was trying to rely on actually showed the reverse, that breakthrough bleeding became worse when the Mercet product used unopposed estrogen. So, again, we had to rebut them, but in the context of this obviousness analysis, which again, the judge was a very conscientious judge. He went down the wrong pathway, he was led down the wrong pathway, but it's not a simple analysis, and this is not a simple technology. But the one thing in an obviousness analysis is you have to apply common sense. He understood that, but what he didn't understand, I believe, is you have to look at it in the context of the whole prior art. And in this context... But you're getting a little bit away from my original question, but what I understand what you're saying is that in the original motion for summary judgment that you filed, it was narrowly focused, and that the record is now fundamentally different, is that what you're saying? It is, and the breakthrough bleeding point, I'm sorry, Your Honor, that is critical because you cannot look at the full context without addressing the number one problem with these extended regiments. To say that there's a motivation, and again, the court was very unclear, didn't identify a specific reason why a person of skill in the art would have started somewhere, would have combined, but you cannot omit the number one problem. A person of skill in the art, whatever the motive is, can't say, I'm going to make a little tweak here, but I'm going to ignore the big elephant in the room, which is the major problem. Can I ask you this? And this is what I guess I was taking from the briefing, that your central argument here is that the evidence of worry about a larger amount of breakthrough bleeding was so severe that it basically taught away from pursuing this particular regiment. And I guess I had two reactions to that. One was that there could well have been, and indeed there was testimony from the other side's expert, Dr. Barnhart, that there were a series of other positive benefits to be reduced withdrawal system, cycle control, that provided an affirmative motivation to pursue this regimen, and that it's possible or imaginable that concerns about breakthrough bleeding would be so severe that somebody motivated by these other benefits would say, no, I'm not going to pursue them, but the evidence really doesn't support that level of severity of this possible negative side effect. At best, there's evidence that says, we don't really know, could be worse, could be better, but not so severe that an interest in these other positive benefits would have been shut down. So tell me what's wrong with that way of thinking about it. First, there's a number of things wrong with that way of thinking. And I'll start with the judge did not rely on the 749 for any motivations whatsoever. He discounted it, and that's clear from A67 and 68. And the reason why the court discounted it is, number one, there's no data whatsoever in the 749 patent to support any benefit. And a person of skill in the art, this is a data-driven industry. And when you look at that, and question. But there is testimony that there was an expectation of getting those benefits, even though, of course, for FDA approval for commercial marketing, the data had not been produced to confirm whether that expectation was, in fact, reliable. And what that omits is the recognition of the teaching away in the 749 patent itself. The 749 patent is very clear, and the court acknowledged this teaching, that it says use the lowest possible dose in your combination pill. And that was the trend in the industry, lowest possible. Their expert admitted it, that a person of skill in the art would clearly want to use the lowest possible dose in line with that. The invention uses a higher dose. It's somewhat higher than the progestin, is that what it is? And the estrogen. Both. By a lot or by a little? By outside the ranges that the 749 patent excludes. Right, but everything outside the range is outside the range. How much outside the range? It's 20% outside the progestin range. It's another 20% outside the estrogen range. But those doses were on the shorter regimen, that is, your doses on the shorter... The doses you use for your 84 days in the combined pill are exactly the doses that are very, very common in the shorter regimen, is that right? No, the doses in our extended regimen of 91 days, what had happened is the art went over 40 years to lower doses in the 28-day regimen, which kept a hormone-free period as well. Every single oral contraceptive did that. Right, but your... And their doses were... I'm sorry, just so that I understand. I thought there was, in fact, a specific finding that one very common pill used for the 28-day regimen, that is, for the 21 days in the 28-day regimen, still does today use exactly the doses that you use in your combination pill for the 84 days as part of your 91-day regimen. Is that right? Well, there is a pill out there that uses those doses, but it's an older pill. The wisdom, the thinking in the art was lower it, keep it as low as possible, exactly as the 749 patent teaches. And a person of skill in the art would not have been motivated to now go against, counter to that conventional wisdom. They're presumed to follow the conventional wisdoms under this court's precedent. And that's why there's no analysis in the court's opinion as to why a person would have done that. What the court ended up doing is retracing the inventor's thought process. The court's analysis didn't use Mercet, not the 749, and extended regimens that had these bad breakthrough bleeding problems. Didn't say why someone would start with that, didn't say why someone would combine it, and said, I'm left with two days of this hormone-free interval. No one had ever tested removing the entire hormone-free interval. It was deemed necessary for a woman to have the period. This inventor did so, and he said during closing arguments to court, I just don't see any reason why she did it. That should have ended it right there, because there was no reason. And so instead what he did in his opinion, which is clear error, is he retraced her steps, her thought process. And he ended up saying it was obvious to try to do what she did, which is eliminate those two days of hormone-free interval. That's hindsight. 103 says you cannot negate the invention by the manner in which the inventor arrived at it. And again, there's no explanation, no reasoning whatsoever as to why someone would have done it, except for it was just two more days. Well, that was the first time anyone had ever removed the entire placebo period and kept a woman on hormones for her entire time period. What do you mean? The words that you just spoke, if I understood them right, do in fact apply to the 749. I don't know whether anybody did it, but that describes it. It absolutely describes it, right? A 91-day regimen, 84 on combined estrogen, progestin, and then there were other seven days not hormone-free, but rather using some kind of low estrogen-only pill. No evidence that anyone had ever did it or tested it or what the results would be. But taught it. The evidence, uncontroverted, admitted by their experts, unpredictable with a change in drug dosage and the hormone-free period, what effect it would have. And so you can't step away from the grand findings. You have to look at that reference. Does it have all the elements? It doesn't. It says, use the lowest possible dose, person of skill in the art. That's important. That's an important teaching. And there's a reason why. It says, use the lowest possible dose in the combo pill, because when you get to that hormone-free interval, we don't want a lot of flux. We want to keep them close. We want to keep that distance close. That's another clear teaching. So a person of the skill in the art reading that, why would they now go against these conventional wisdoms and say, I want to use these higher doses in my pill, higher doses that had these tremendous breakthrough bleeding problems? Mr. Pettis, you're into your rebuttal time. Do you want to use it or save it? Unless Your Honors have another question, I will save it. Mr. Kress, is it? Thank you. Can we start near the end of his argument? Unless there's an opening statement you want to make.  Basically. As I understand your argument in response to the references to the inventor testimony, I mean, you don't really defend what the trial court did in that regard, but you say that was really sort of an after-the-fact thought and that he'd already made his finding first. Is that what your view is as it relates to the inventor testimony? In essence, yes. It's clear reading the opinion that the inventor testimony was discussed. Inventor testimony was brought to trial by Teva, and their effort was, in fact, to try to explain why there was some flash of genius associated with what the inventor did. The trial court, in his opinion, assessed the evidence from the perspective of the person having skill in the art, clearly said he was going to do that, he clearly did that, and he then made his credibility determination, which is the linchpin of the opinion, and then declared that, looking at all the evidence from the perspective of the skill in the art, the patent was obvious. But you concede, though, that to the extent he said the inventor is the person's skill in the art, and because she figured it out, it had to have been obvious. You concede that that is not consistent with our legal standards. I'm just trying to understand where, as I read your briefs, you're just saying compartmentalize that because there was enough else in the record. Is that right? To the extent what the trial court did was standing in the shoes, taking the inventor, when he did his reality check, after he found that a person having skill in the art would find this to be obvious, once he did that, he said, to check against hindsight, I am going to look at the inventor's testimony. And so that portion of the opinion, to the extent that runs afoul of this court's instructions, is in fact surplusage, and can be disregarded as extremely harmless error, because he absolutely evaluated the evidence from a person having skill in the art, without hindsight, and he went through all the gram factors, and he made his determination. His whole analysis is two pages, right? Your Honor, it's our position that the entirety of the opinion is his analysis. And what he did was perhaps unusual, but what he did was he looked at all of the art before making any determinations, which is what he was supposed to do. He looked at the full scope of the art, he evaluated all of the evidence throughout the bulk of the opinions, 20 some pages of evaluation of the art. Then what he said was, after looking at that, and he addressed both the perspective of the plaintiff's expert, Dr. Shulak, and the defendant's experts, with each piece of art. Then what he said was, the fundamental problem I have in this case, the art's the art. The fundamental problem I have in this case is that the two experts are diametrically opposed in the way they interpret the art. So the two pages that you're referring to, the first page being the most relevant, what the trial court did is said, I'm going to resolve the credibility of these two competing experts' versions of the art. And I've made a determination, as he explains in his opinion, that Dr. Shulak is lacking in credibility. And there's several reasons why he said so, and there's... But he didn't say what his reasons were. He just said, I like all these experts, I don't like these experts, this is my bottom line conclusion. I mean, he could theoretically reverse solely because there are no findings of fact and conclusions of law, or detailed findings of fact and conclusions of law that cite to the record the things that we require. I mean, that every court of appeals requires from a bench trial. I mean, that's what's supposed to follow from a bench trial, right? Our contention is that he actually explained his reasonings for finding that Dr. Shulak was without credibility. And he does so on this page 45 of his opinion. There's two paragraphs where he describes her even refusal to recognize what was a common practice in the industry, which was tricycling. And instead, she described it as being a concept. Instead of something that was in practice, it was even in her practice. And then the other thing that he describes in his determination that she lacked credibility was in his paragraph describing the Rosenberg article and the Merced articles regarding breakthrough bleeding, found that she was exaggerating, as I think Teva does here today, the problem of breakthrough bleeding. And he finds that Dr. Shulak was lacking credibility because when you look at the art as a whole, the Merced articles and the Rosenberg articles, all of them are actually favorable with respect to the concepts that were being developed, which are the two concepts of extending the regimens and introducing unopposed estrogen during the home run free interval that they were looking... For purposes of efficacy, right? I mean, yes, you can prevent pregnancy if someone actually takes the pill. But they're not going to take it if there's no cycle control. The opinion explains that there were efficacy positive results. There were other positive results, but also that they had acceptable breakthrough bleeding profiles. Bleeding profiles were okay with Merced. It was a product that was working, and the articles were generally favorable. Teva points to one data point in one article which was not overall unfavorable toward the course. And that's not true because even the article, which is the Rosenberg article, even that article was favorable toward this regimen. Even that article said, with respect to its data findings, that they themselves are questionable because there wasn't a big sample and because it's as likely as a result of chance as anything else. So the notion that there's this gigantic elephant size breakthrough bleeding problem with these extended regimens is simply exaggerated. That's what the court found. So we're supposed to assume that when the court said, I find these guys credible, I find her not credible, that that means every single thing they said at trial was a finding of fact by the court? Because that's the only way we can get there. Well, I think the findings of fact from the court stem from that credibility determination and then his analysis of the art and then at the end. But if the scope of the credibility problem that he found was more than just these two little pieces and paragraphs, he finds that the weight of her testimony is discounted with respect to the prior art as a whole. She is not believable as to the state of the prior art. And so that determination, which is entitled to great deference, because he saw these witnesses, one of the major differences. Maybe I should go back to being a district judge because this would make my life really easy. So I could just say at the end of trial, you know, you just weren't credible on any of the critical elements and you were credible on critical elements. Therefore, I find X. I mean, I don't have to make findings of fact? He does do more than that. He describes every piece of art. He just explains what it taught as explained by the various experts. But he does, I mean, it's a long opinion. He goes through each of the teachings of the arts and explains, you know, what is found in that art. All of that is unassailable. It's a matter of record. So he does explain all of the evidence that he received. And he also explains all the evidence with respect to the secondary consideration. So he does do a little more than that. The opinion is a little bit unorthodox in that he does base his opinion on this balance that he saw between the two experts. Because the art's there and there's just a different spin on it by the competing experts. And the TEVA spin, which includes this monumental problem with breakthrough bleeding, which wasn't even the object of the invention, was one of the other motivations which TEVA ignores, which is improving the symptoms of PMS and PMDD, which is something that their own expert touted in the industry as being a good reason to have the unopposed estrogen and have the extended cycles. Am I remembering right that in the earlier litigation, the Duramed litigation, that TEVA tried out how persuasive the idea was that the PMS symptoms were a dramatic improvement and then kind of walked away from that in this litigation? They've been walking away from this theory in litigation since the Duramed came out. And the reason is that there are three motivations to combine the references. And the references, as you all know, are very clear. The COVAX reference has the 84-day regimen quite clearly described in the full dosage strength that is in here. And then you have the 749 that introduces either 10 or 15. And here we have 10 of the micrograms of the EE during the hormone-free period. The motivations that exist that were presented at trial are the full motivations. That's one of the differences between the Duramed court and this case is all three motivations. The three motivations being the PMS symptoms, which is if you have the unopposed estrogen during the hormone-free period, you reduce the symptoms of the hormone withdrawal and you have less headaches. That's one of the things that Dr. Shulak did. That's the motivation that decided the opinion in Duramed. And so they moved away from that, although that motivation remains in full force in effect and was very persuasive at trial. The second motivation is efficacy. And that is a situation where you have, although all these contraceptives are fairly effective, when you have a missed pill at the beginning of your retaking the combination pill after your hormone-free period, you do have a problem of unwanted pregnancy during that period. And it was found in the ART, and this is ART that was presented at trial that was not before the Duramed court, that you have a reduced, you have greater follicular suppression if you take the unopposed estrogen during the seven days. There's data associated with that. And so you would have, then if you missed the pill when you start up again, you have less likelihood of having an unwanted pregnancy. This battle on efficacy versus the cycle control and whether you could have one without the other, that also explains why you, in large measure, walked away from the 749 at trial because the 749 went to the headache issue. The 749 patent discloses all three motivations, and the third being a better relieving profile. But it's not an anticipation case because it doesn't disclose the same dosage. The only reason 749 is not an anticipation in this case is that the disclosure with respect to the particular combination is 125 and 25 instead of 150 and 30. The trial court never cites the 749 in terms of the findings. It depends on how you interpret the findings. When the court made the determination that the patent was obvious, he did so expressly looking at the art as a whole. This is what he's told to do. And he went through the entirety of the art before he did that. And he also discussed the secondary considerations before he did that as he's been taught to do by this court. And he absolutely talks for several pages about the 749 teachings and the 749 patent. But it's not... Other than just saying I'm looking at everything, can you show me where in his conclusions, in his findings, that he actually compared the limitations of Claim 19 to the art? There's no place in his opinion where he says the Claim 19 has the following components except at the beginning where he does describe the components of the Claim 19. And then as he describes, there's no place where he lines them up. But what he has done in every element, it's not a... They say it's the gist of the invention. And that's not so because he does describe the entirety of Claim 19 in the beginning of his opinion. And then as he's talking about the art... All he says is this is what Claim 19 is. But I mean, really, there's supposed to be... I mean, this is sort of Patent Law 101, right? I mean, you're supposed to compare the limitations of the claim to the prior art. I absolutely can see it would be preferable had he done so. But to make no mistake about it, everything that is in the Claim 19 is in the disclosed art. And this court knows that, and the opinion does also disclose that. Because as he's going through the art, he does describe every piece of the regimen that's associated with Claim 19. It's all in there. And he doesn't... You want us essentially to go through the record and make the findings on our own? I don't think it's necessary to do so. Because you don't have to go through the record to do it. Because it is in the opinion. But if it is a de novo review of the legal conclusions, and one of the legal conclusions is that it's all there, and you want to test that, it can be done easily. Because there is no secret to the Claim 19. It's COVAX plus 749-PAT. You're also relying on Judge Markey's dictum that we review judgments, not opinions. Yes, and it's certainly preferable in this instance that you look at. And Claim 19 is a series of dosages of two substances which are all in the prior art. There's not a missing piece in there. There's nothing secret about Claim 19 that wasn't fully disclosed. And really, there's plenty of art, and there's additional art disclosed at trial that wasn't before the Durham Med Court. But you don't need to go much further than COVAX and 749. We have the motivations to combine those references that are unassailable. All of the arguments against it are based on this expert who was, in fact, discredited. And all of the evidence that they're going to come up and talk about with respect to breakthrough bleeding, which was not the number one problem. The object of the invention was to improve symptoms of PMS and PMDD. But even with breakthrough bleeding, it was postulated clearly in the art that you might get a better bleeding profile if you introduce unopposed estrogen during the hormone-free period. And so there is all of these disclosures. Everything that's taught, the motivations and the actual combination of what actually turned into this drug, Seasonic, is in the art. And it's in the art that the strength that they then introduced when Claim 19 came. And as an aside, the 749 patent comes very close to being an anticipatory reference. It goes up to 125 of the progestin, 25 of the unopposed estrogen. The next increment up, because the progestins are in increments of 25 and the estrogens are in increments of 5, the next increment up is the invention. So it's not a situation where now we're looking at a substantially higher dose. Because high doses of these things are quite a bit above the actual dosage of the invention, 150 and 30, for the 84-day period. And of course, on the unopposed estrogen, it's the exact amount disclosed in 749. But COVAX and the actual Seasonal product was, in fact, the exact dosage, 150 of progestin and 30 of unopposed estrogen, or of the estrogen. And that exact amount is disclosed in the COVAX reference. And so there's no magic associated with it. Mr. Kratz, as you can see, a red light has been on a little bit. So we will conclude your argument and hear from Mr. Pettis. Thank you. And let's do a little rebuttal time. Three minutes. Thank you, Your Honors. Let me first address this point about the 749 being one dosage above. Well, you've got to look at the 749. It's got, by admission as our own expert, the preferred embodiments, over 1,800 possibilities with no guidance whatsoever over which one to choose. And they're saying a person of skill in the art is going to read that and not choose any of them and instead go outside what it says to use the lowest possible dose. It excluded that higher dose for a reason. It said use lower doses. Why? Because we need to get these benefits, and the patent says it. It's not our expert. The patent says it, and they're experts admitted to it. Can I just ask, I guess it would have been your expert. Was there a testimony that said as to the 749, it really taught strongly away from the next increment of those two doses? There is the court's finding at page 857 that all the experts agreed that it excluded the higher doses. That it did not include. That's true on its face. I'm asking whether there's testimony to support the argument you're now making that by stopping where it stopped, it really discouraged, affirmatively discouraged readers from making that extra step. There is certainly testimony from our expert. There is also in the record testimony from the other side's expert where he agreed that the patent's teaching that column four, line 37, which says verbatim use as low a dose as possible is what it's teaching the person. Didn't Kovacs and Merced utilize 150 of the progesterone? Merced did not, Your Honor. Merced actually was a completely different drug at a much lower dose. Kovacs did. Kovacs did. And Merced wasn't a progesterone? Merced included a progesterone but a different progesterone. And this is the apples and oranges that the court is trying to combine. A low dose 28-day regimen, Merced, which has five of seven days with these extended regimens that have the higher doses. And he's saying someone would combine them, but he gives no reason why they would. Positive results? What positive results? Not breakthrough bleeding, that's for sure. Again, we're not relying just on our expert. At A51 in footnote 13, the court credits the cross-examination of their expert where it was the other side's expert who said, oh, I was misinterpreting the data. The breakthrough bleeding reversed and got worse. So, again. How do you deal, though, with the argument that your friend on the other side has made, which is that to the extent that your strongest evidence about the problem of breakthrough bleeding being a teaching away comes from your own expert who the judge generally discredited? Again, we disagree with that. It's certainly strong evidence, but what she's doing is corroborating what was taught in the Rosenberg article. Again, the judge didn't come out and say his findings were nonspecific. He discredited their expert on that article, Rosenberg, when the expert acknowledged that the data in Rosenberg that the expert had earlier in his testimony on direct said this is the only hard data in the evidence, in the record, and I'm reliant to show an improvement of breakthrough bleeding. He had to reverse field and say, no, it shows the opposite. And the Rosenberg, it's not a little bit the opposite. Rosenberg says at page A5725 with respect to the fourth cycle, and this is the later cycle when this unopposed estrogens is supposed to be taking effect. It says the women had significantly poorer cycle control. Now, where is that on the page? It's in the right-hand column towards the bottom. Okay. Among starters in the fourth cycle, women using Mercet had significantly poorer cycle control than of less users. And, Your Honor, may I? Okay, go ahead. Okay. And just, again, it's not just our expert on this breakthrough bleeding problem. Their expert admitted it was the number one problem with extended regiments. Admitted on the record. And Mr. Pettis, I think your time is up. So unless Judge O'Malley has further questions, we'll take the case and revise it. Thank you.